**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *Plaintiff-Appellant*, <br><br> v. <br><br> RYAN ZINKE, Secretary of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; GEORGE E. PERDUE, Secretary of Agriculture; UNITED STATES DEPARTMENT OF AGRICULTURE; BUREAU OF LAND MANAGEMENT; MICHAEL NEDD, acting director, Bureau of Land Management; UNITED STATES FOREST SERVICE, *Defendants - Appellees*, <br><br> GRAND CANYON TRUST; SIERRA CLUB; NATIONAL PARKS CONSERVATION ASSOCIATION; CENTER FOR BIOLOGICAL DIVERSITY; HAVASUPAI TRIBE, *Intervenor-Defendants-Appellees.* | No. 14-17350 <br><br> D.C. Nos. <br> 3:11-cv-08171-DGC <br> 3:12-cv-08038-DGC <br> 3:12-cv-08042-DGC <br> 3:12-cv-08075-DGC |

ARIZONA UTAH LOCAL
ECONOMIC COALITION, on
behalf of member the Board of
Supervisors, Mohave County,
Arizona; METAMIN
ENTERPRISES USA, INC.,
           *Plaintiffs-Appellants*,

v.

RYAN ZINKE, Secretary of the
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
GEORGE E. PERDUE, Secretary
of Agriculture; UNITED STATES
DEPARTMENT OF AGRICULTURE;
BUREAU OF LAND
MANAGEMENT; MICHAEL
NEDD, acting director, Bureau
of Land Management; UNITED
STATES FOREST SERVICE,
           *Defendants-Appellees*,

GRAND CANYON TRUST; SIERRA
CLUB; NATIONAL PARKS
CONSERVATION ASSOCIATION;
CENTER FOR BIOLOGICAL
DIVERSITY; HAVASUPAI TRIBE,
           *Intervenor-Defendants-
                   Appellees*.

No. 14-17351

D.C. Nos.
3:11-cv-08171-DGC
3:12-cv-08038-DGC
3:12-cv-08042-DGC
3:12-cv-08075-DGC

AMERICAN EXPLORATION &
MINING ASSOCIATION,
          *Plaintiff-Appellant*,

v.

RYAN ZINKE, Secretary of the
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
GEORGE E. PERDUE, Secretary
of Agriculture; UNITED STATES
DEPARTMENT OF AGRICULTURE;
BUREAU OF LAND
MANAGEMENT; MICHAEL
NEDD, acting director, Bureau
of Land Management; UNITED
STATES FOREST SERVICE,
          *Defendants-Appellees*,

GRAND CANYON TRUST; SIERRA
CLUB; NATIONAL PARKS
CONSERVATION ASSOCIATION;
CENTER FOR BIOLOGICAL
DIVERSITY; HAVASUPAI TRIBE,
          *Intervenor-Defendants-
          Appellees*.

No. 14-17352

D.C. Nos.
3:11-cv-08171-DGC
3:12-cv-08038-DGC
3:12-cv-08042-DGC
3:12-cv-08075-DGC

GREGORY YOUNT,
        *Plaintiff-Appellant*,

v.

RYAN ZINKE, Secretary of the
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
GEORGE E. PERDUE, Secretary
of Agriculture; UNITED STATES
DEPARTMENT OF AGRICULTURE;
BUREAU OF LAND
MANAGEMENT; MICHAEL
NEDD, acting director, Bureau
of Land Management; UNITED
STATES FOREST SERVICE,
        *Defendants-Appellees*,

GRAND CANYON TRUST; SIERRA
CLUB, NATIONAL PARKS
CONSERVATION ASSOCIATION;
CENTER FOR BIOLOGICAL
DIVERSITY; HAVASUPAI TRIBE,
        *Intervenor-Defendants-*
        *Appellees.*

No. 14-17374

D.C. Nos.
3:11-cv-08171-DGC
3:12-cv-08038-DGC
3:12-cv-08042-DGC
3:12-cv-08075-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted December 15, 2016[*]
San Francisco, California

Filed December 12, 2017

Before: Marsha S. Berzon and Mary H. Murguia, Circuit
Judges, and Frederic Block, District Judge.[**]

Opinion by Judge Berzon

## SUMMARY[***]

### Mining Claims

The panel affirmed the district court's decision rejecting
challenges to the decision of the Secretary of the Interior to
withdraw from new uranium mining claims, up to twenty
years, over one million acres of land near Grand Canyon
National Park.

The Federal Land Policy and Management Act of 1976
("FLPMA") reserves to Congress the power to take certain
land management actions, such as making or revoking

---

[*] Case No. 14-17351 was submitted on the briefs without oral
argument on the motion of the appellants in that case.

[**] The Honorable Frederic Block, United States District Judge for the
Eastern District of New York, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

permanent withdrawals of large tracts from mineral extraction, 43 U.S.C. § 1714(c), (j). Congress has never exercised its authority under FLPMA to veto a large-tract withdrawal. FLMPA also delegates to the Secretary the power to make temporary or permanent withdrawals of small tracts, and temporary withdrawals of large-tract parcels.

The district court held that the legislative veto provision of FLPMA was unconstitutional, but severable; and this left the Secretary's challenged withdrawal authority intact.

The panel held that the appellants, which were mining companies and local governments, had standing to raise the severability issue. The panel further held that the unconstitutional legislative veto embedded in section 240(c)(1) of FLPMA was severable from the large-tract withdrawal authority delegated to the Secretary in that same subsection. The panel held that invalidating the legislative veto provision did not affect the Secretary's withdrawal authority.

Turning to the merits of the FLPMA claims, the panel rejected appellants' challenges to each of the Secretary's rationales for the land withdrawal. First, the panel held that the Secretary's decision to withdraw the large tract of land to protect water resources in the Grand Canyon watershed and the Colorado River from possible water contamination was not arbitrary, capricious, or not in accordance with the law. Second, the panel held that FLPMA and case law did not prevent the Secretary from withdrawing large tracts of land in the interest of preserving cultural and tribal resources. Third, the panel held that the record supported the conclusion that there would be a significant impact on visual resources and a risk of significant harm to wildlife absent the

withdrawal. Finally, the panel held that the agency's findings regarding the quantity of uranium in the withdrawn area were not arbitrary or capricious, as the agency relied on peer-reviewed data and reasonably explained why it did not adopt appellants' alternative version.

The panel held that the Secretary did not act arbitrarily or capriciously in setting the boundaries of the withdrawn area. The panel also held that the Secretary did not contravene the principle that land management under FLPMA "be on the basis of multiple use and sustained yield." 43 U.S.C § 1701(a)(7). The panel held that consonant with the multi-use principle, the Secretary engaged in a careful and reasoned balancing of the potential economic benefits of additional mining against the possible risks of environmental and cultural resources. Finally, the panel held that the final environmental impact statement took existing legal regimes into account but reasonably concluded that they were inadequate to meet the purposes of the withdrawal.

Appellant Gregory Youndt alleged that precluding new mining claims on federal land out of concern that the area had sacred meaning to Indian tribes violated the Establishment Clause of the First Amendment. The panel held that this Establishment Clause challenge failed under the test in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

The panel also rejected appellants' allegations that the withdrawal violated the National Environmental Policy Act ("NEPA"). First, the panel deferred to the agency's judgment about the proper level of analysis. Namely, the Record of Decision properly concluded that any missing information was non-essential, and the final environmental impact statement identified that missing information, discussed its

relevance, weighed the available scientific evidence, and presented its conclusions regarding potential environmental impact based on the available data. Second, the panel held that the Secretary complied with the requirements in FLPMA and NEPA regarding consultation with local government. Specifically, the panel held that the record demonstrated that the Secretary fully acknowledged and considered the local Counties' concerns regarding the withdrawal; and the final environmental impact statement and Record of Decision did consider approved county plans and found no inconsistencies or conflicts in compliance with 40 C.F.R. § 1506.2(d).

Part of the withdrawn area included land managed by the United States Forest Service, and the Forest Service provided its requisite consent to include the land in the withdrawal area. The panel rejected appellants' contention that the Forest Service's consent to the withdrawal was arbitrary, capricious, or otherwise not in accordance with law because it did not comply with the National Forest Management Act's multiple use mandate, 16 U.S.C. § 1604(e), or the terms and conditions of the Kaibab National Forest Plan established under the Act.

**COUNSEL**

Robert Timothy McCrum (argued), Crowell & Moring LLP, Washington, D.C., for Plaintiff-Appellant National Mining Association.

Jeffrey Wilson McCoy (argued) and Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colorado, for Plaintiff-Appellant American Exploration & Mining Association.

Constance E. Brooks, Danielle Hagen, and Cody Doig, C. E. Brooks & Associates P.C., Denver, Colorado, for Plaintiff-Appellant Arizona Utah Local Economic Coalition.

Gregory Yount, Chino Valley, Arizona, pro se Plaintiff-Appellant.

Brian C. Toth (argued) and John C. Most, Attorneys; John C. Cruden, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Aaron G. Moody, Kendra Nitta, and Sonia Overholser, Office of the Solicitor, United States Department of the Interior; Pamela P. Henderson, Office of the General Solicitor, United States Department of Agriculture; for Defendants-Appellees.

Edward B. Zukoski (argued), Earthjustice Denver, Colorado; Roger Flynn, Western Mining Action Project, Lyons, Colorado; Aaron M. Paul, Grand Canyon Trust, Denver, Colorado; for Intervenor-Defendants-Appellees.

Anthony L. Rampton, Kathy A.F. Davis, and Roger R. Fairbanks, Assistant Attorneys General; Bridget K. Romano,

Solicitor General; Sean D. Reyes, Attorney General; Office of the Attorney General, Salt Lake City, Utah; Mark Brnovich, Attorney General, Office of the Attorney General, Phoenix, Arizona; Tim Fox, Attorney General, Department of Justice, Helena, Montana; Adam Paul Laxalt, Attorney General, Office of the Attorney General, Carson City, Nevada; for Amici Curiae States of Utah, Arizona, Montana, and Nevada.

Heather Whiteman Runs Him and Matthew L. Campbell, Native American Rights Fund, Boulder, Colorado, for Amici Curiae Paiute Indian Tribe of Utah, Hualapai Tribe of the Hualapai Reservation, Kaibab Band of Paiute Indians, San Juan Southern Paiute Tribe, Northwestern Band of the Shoshone Nation, Morning Star Institute, and National Congress of American Indians.

Katherine Belzowski, Attorney; Ethel B. Branch, Attorney General; Navajo Nation Department of Justice, Window Rock, Arizona; for Amicus Curiae Navajo Nation.

## OPINION

BERZON, Circuit Judge:

We consider challenges to the decision of the Secretary of the Interior to withdraw from new uranium mining claims, for up to twenty years, over one million acres of land near Grand Canyon National Park. Determining the appropriate balance between safeguarding an iconic American natural wonder and permitting extraction of a critically important mineral is at the heart of the present dispute.

The fission of uranium atoms into smaller component parts releases a huge amount of energy — enough to sustain a nuclear chain reaction, as scientists discovered in the first half of the last century. The design and construction of nuclear reactors and weaponry followed. In the ensuing years, uranium became, at times, highly valuable, though prices rose and fell dramatically in response to swings in demand. Uranium also entered the cultural lexicon.[1]

In 1947, large quantities of uranium were discovered in Arizona near Grand Canyon National Park, a treasured natural wonder and World Heritage Site — called, by John Wesley Powell, "the most sublime spectacle in nature." John Wesley Powell, *Canyons of the Colorado* 394 (1895). Northern Arizona saw limited uranium mining until a spike in uranium prices in the late 1970s led to a uranium mining surge in the 1980s and 1990s, when six new mines opened. But the mining boom did not last. With the collapse of the Soviet Union and consequent decommissioning of large numbers of nuclear warheads, demand for uranium dropped dramatically in the 1990s. Uranium production in much of northern Arizona stopped.

Prices spiked again in 2007, and renewed interest in mining operations in the region followed. With that

---

[1] For example, in the heyday of uranium mining, "Moab changed the name of its annual rodeo from Red Rock Roundup to Uranium Days Rodeo." Stephanie A. Malin, *The Price of Nuclear Power: Uranium Communities and Environmental Justice* 37 (1981). "In the 1950s, young women were crowned as Uranium Queen and Miss Atomic Energy." *Id.* Even now, uranium is the subject of its own film festival — the International Uranium Film Festival — featuring several films set in and around the American Southwest. *See* Int'l Uranium Film Festival, http://www.uraniumfilmfestival.org.

resurgence came concerns about the environmental impact of the extraction of radioactive materials such as uranium.

Reflecting those concerns, then-United States Secretary of the Interior ("the Secretary")[2] Kenneth L. Salazar published a Notice of Intent in the Federal Register to withdraw from new uranium mining claims, for a period of up to twenty years, a tract of nearly one million acres of federally owned public land. *See* Federal Land Policy and Management Act of 1976 ("FLPMA")[3] § 204(c), 43 U.S.C. § 1714 (authorizing the Secretary to make, revoke, or modify such withdrawals subject to certain conditions).[4]  After an extended study period, the Secretary issued a Record of Decision ("ROD") in January 2012 announcing the withdrawal of 1,006,545 acres.

Several entities and one private individual opposed to the withdrawal challenged the Secretary's decision in four separate actions filed in the District of Arizona.  Parties interested in supporting the withdrawal moved to intervene, including four environmental groups and the Havasupai

---

[2] Although it is the Secretary who has ultimate authority to make a withdrawal, we occasionally refer to the Secretary as "the Interior" to better reflect that the Secretary's withdrawal decision was informed by extensive analysis within the Department of the Interior and its constituent agencies.

[3] See Appendix A for a list of acronyms used in this opinion.

[4] A "withdrawal" means "withholding [of] an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program." 43 U.S.C. § 1702(j).

Tribe. The district court, in two well-crafted opinions, rejected the various challenges to the withdrawal.

## I.  Background

We begin with a brief history of the political and legislative backdrop against which FLPMA was enacted in 1976.

The Property Clause of the U.S. Constitution vests in Congress the "power to dispose of and make all needful rules and regulations respecting . . . property belonging to the United States," including federally owned public lands. U.S. Const., Art. IV, § 3, cl. 2. Congress has long used its authority under the Property Clause to permit the purchase of mining rights and exploration on federal lands, most notably in the General Mining Act of 1872, 30 U.S.C. §§ 22–54. Under that Act, "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase." 30 U.S.C. § 22.

From early on, the executive branch has asserted and exercised the authority to withdraw federally owned lands from claims for mineral extraction. *See United States v. Midwest Oil Co.*, 236 U.S. 459, 469–72 (1915). As *Midwest Oil* recognized, although Congress had delegated no "express statutory authority" to withdraw previously available land from mineral exploitation, the executive branch had made a "multitude" of temporary such withdrawals, and Congress had "uniformly and repeatedly acquiesced in the practice." *Id*. at 469–71. That acquiescence, *Midwest Oil* held, constituted an "implied grant of power" from Congress to the executive permitting withdrawal of public lands from mineral

extraction claims. *Id*. at 475. For decades after *Midwest Oil*, Congress did little to restrain the executive's withdrawal authority, and the executive branch made liberal use of it.

After World War II, however, demand for the commercial use of public land increased considerably. To address that increased demand, Congress in 1964 established the Public Land Law Review Commission ("PLLRC"), composed of several members of Congress and presidential appointees, to conduct a comprehensive review of federal land law and policy and propose suggestions for more efficient administration of public lands. After several years of study the PLLRC issued a report making 137 specific recommendations to Congress concerning the use and governance of public lands. PLLRC, *One Third of the Nation's Land* ix–x, 9 (1970) (hereinafter "PLLRC Report").

The PLLRC Report observed that the roles of Congress and the executive branch with respect to public land use had "never been carefully defined," and recommended that Congress pass new legislation specifying the precise authorities delegated to the executive for land management, including withdrawals. *Id*. at 43, 44, 54–55. The Report also recommended that "large scale limited or single use withdrawals *of a permanent or indefinite term*" should be within Congress's exclusive control, while "[a]ll other withdrawal authority should be expressly delegated with statutory guidelines to insure proper justification for proposed withdrawals, provide for public participation in their consideration, and establish criteria for Executive action." *Id*. at 54 (emphasis added). The Report did not recommend a legislative veto over any withdrawal authority delegated to the executive.

In response to the PLLRC's recommendations, Congress in 1976 enacted FLPMA.  FLPMA declares as the policy of the United States that "Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action," 43 U.S.C. § 1701(a)(4); that "in administering public land statutes and exercising discretionary authority granted by them, the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public[,] and to structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking," 43 U.S.C. § 1701(a)(5); that "goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield unless otherwise specified by law," 43 U.S.C. § 1701(a)(7)[5]; and that "the public lands be managed in a

---

[5] "Multiple use" is defined in the statute as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic

manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; [in a manner] that, where appropriate, will preserve and protect certain public lands in their natural condition; [in a manner] that will provide food and habitat for fish and wildlife and domestic animals; and [in a manner] that will provide for outdoor recreation and human occupancy and use," 43 U.S.C. § 1701(a)(8).

As relevant here, FLPMA eliminates the implied executive branch withdrawal authority recognized in *Midwest Oil*, and substitutes express, limited authority. *See* Pub. L. 94–579, § 704, Oct. 21, 1976, 90 Stat. 2743, 2792. It reserves to Congress the power to take certain land management actions, such as making or revoking permanent withdrawals of tracts of 5,000 acres or more ("large-tract" withdrawals) from mineral extraction. 43 U.S.C. § 1714(c), (j). And it delegates to the Secretary of the Interior the power to make withdrawals of tracts smaller than 5,000 acres ("small-tract" withdrawals), whether temporary or permanent, 43 U.S.C. § 1714(d), and to make temporary withdrawals of large-tract parcels of 5,000 acres or more, 43 U.S.C. § 1714(c).

For all withdrawals, whether small- or large-tract, FLPMA requires that the Secretary publish notice of the proposed withdrawal in the Federal Register; afford an opportunity for public hearing and comment; and obtain consent to the withdrawal from any other department or agency involved in the administration of the lands proposed for withdrawal. 43 U.S.C. § 1714(b), (h), (i). The statute also bars the Secretary from further delegating his or her

return or the greatest unit output." 43 U.S.C. § 1702(c).

withdrawal authority to any individual outside the Department of the Interior, or to any individual within the Department who was not appointed by the President and confirmed by the Senate. 43 U.S.C. § 1714(a).

FLPMA circumscribes the Secretary's temporary large-tract withdrawal authority in three ways relevant here. First, the Secretary may make large-tract withdrawals lasting no longer than twenty years. Second, no later than the effective date of any withdrawal, the Secretary must furnish a detailed report to Congress addressing twelve specific reporting requirements.[6]  43 U.S.C. § 1714(c)(2).  Third, FLPMA provides that Congress retains legislative veto power over any large-tract withdrawal.[7]  43 U.S.C. § 1714(c)(1).  FLPMA

---

[6] These reporting requirements include (1) a "clear explanation" of the proposed use of the land involved; (2) an inventory and evaluation of the current natural resource uses of the site and the impact of the proposed use, including potential environmental degradation and anticipated economic impact; (3) a list of present users of the land and the anticipated impact upon those users; (4) an analysis of potential conflicts between current users and the proposed use; (5) an analysis of the requirements for the proposed use; (6) an analysis of suitable alternative sites; (7) a statement of any consultation with other federal, state, and local regulators; (8) a statement of the impact of proposed uses on state and local government and the regional economy; (9) the time needed for the withdrawal; (10) the time and place of public hearings; (11) the location of publicly accessible records; and (12) the report of a qualified mining engineer. 43 U.S.C. § 1714(c)(2).

[7] Specifically, "a withdrawal aggregating five thousand acres or more may be made (or such a withdrawal or any other withdrawal involving in the aggregate five thousand acres or more which terminates after such date of approval may be extended) only for a period of not more than twenty years by the Secretary on his own motion or upon request by a department or agency head. The Secretary shall notify both Houses of Congress of such a withdrawal no later than its effective date and the withdrawal shall

also contains a severability clause: "If any provision of this Act or the application thereof is held invalid, the remainder of the Act and the application thereof shall not be affected thereby." FLPMA § 707, 90 Stat. at 2794 (codified at notes to 43 U.S.C. § 1701).

Congress has never exercised its authority under FLPMA to veto a large-tract withdrawal. In 1983, the Supreme Court in *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983), declared one variety of legislative veto provision unconstitutional.[8] Since *Chadha*, Congress has not amended FLPMA to limit the Secretary's withdrawal authority further.

## A.  The Northern Arizona Withdrawal

Uranium, often found within "breccia pipes" — cylinder-shaped deposits of broken sedimentary rock stretching thousands of feet underground — was first discovered near

---

terminate and become ineffective at the end of ninety days (not counting days on which the Senate or the House of Representatives has adjourned for more than three consecutive days) beginning on the day notice of such withdrawal has been submitted to the Senate and the House of Representatives, if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the Presidential recommendation." 43 U.S.C. § 1714(c)(1).

[8] *Chadha* dealt with a one-house veto of the Attorney General's discretionary decision to suspend deportation. *Chadha*, 462 U.S. at 927. FLPMA provides for a legislative veto by "concurrent resolution" of both houses. 43 U.S.C. § 1714(c)(1).

Grand Canyon National Park in 1947. Only limited uranium mining occurred in Northern Arizona until uranium prices increased in the late 1970s. After that, in the 1980s and 1990s, miners extracted 1,471,942 tons of uranium from six new mines. A second spike in the price of uranium in 2007 generated renewed interest in mining operations near the Grand Canyon, manifested in the submission of thousands of new claims.[9]

The large volume of new claims sparked concerns about the potential environmental impact of increased uranium mining on the Grand Canyon watershed. Uranium mining has been associated with uranium and arsenic contamination in water supplies, which may affect plant and animal growth, survival, and reproduction, and which may increase the incidence of kidney damage and cancer in humans. *See, e.g.*, National Primary Drinking Water Regulations, Radionuclides, 65 Fed. Reg. 76,708 (Dec. 7, 2000). In response to local concerns, Arizona Congressman Raúl Grijalva introduced legislation in March 2008 seeking permanently to withdraw over one million acres of federal land abutting Grand Canyon National Park, on the northern side (North Parcel), northeastern side (East Parcel), and southern side (South Parcel) of the Park. Rep. Grijalva's proposed legislation was not enacted.

In 2009, Secretary Salazar published a Notice of Intent in the Federal Register declaring that he proposed to withdraw from new uranium mining claims an area nearly identical to that covered by the Grijalva bill. Notice of Proposed Withdrawal and Opportunity for Public Meeting, 74 Fed.

---

[9] Within a few years, the price of uranium dropped sharply once more, from $130 per pound to $40 per pound.

Reg. 35,887 (July 21, 2009).  In compliance with FLPMA's command, the Secretary stipulated that any agency action would be "subject to valid existing rights."  *Id.*; FLPMA § 701(h), 90 Stat. at 2786 (codified at notes to 43 U.S.C. § 1701).  The Notice of Intent had the immediate effect of withdrawing the land from new uranium mining claims for two years while the agency studied the anticipated impact of the proposed withdrawal.  74 Fed. Reg. at 35,887.

In fulfillment of the Interior's obligation under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, the Bureau of Land Management ("BLM"), an agency within the Department of the Interior, prepared an Environmental Impact Statement ("EIS") examining the potential environmental impact of the withdrawal.  The EIS declared that the underlying purpose of the withdrawal was protecting the "Grand Canyon watershed from adverse effects of . . . mineral exploration and mining" other than those "stemming from valid existing rights."  74 Fed. Reg. at 43,152–53.  To inform the EIS, BLM requested a full report from the United States Geological Survey ("USGS") analyzing soil, sediment, and water samples in the proposed withdrawal area.

In response, USGS prepared Scientific Investigations Report 2010–5025 (the "USGS Report").  To prepare its report, USGS examined 1,014 water samples from 428 different sites.  It found that 70 samples "exceeded the primary or secondary maximum containment levels" for certain ions and trace elements, including uranium and other heavy metals.  The agency also analyzed soil and sediment samples from six sites north of the Grand Canyon, including reclaimed uranium mines, approved mining sites where mining had been suspended, and exploratory sites (sites

where there had been drilling but not mining). Consistently high concentrations of uranium and arsenic were discovered at these sites. Water samples from fifteen springs and five wells contained dissolved uranium levels beyond the maximum allowed by the Environmental Protection Agency ("EPA") for drinking water. The USGS Report observed that fractures, faults, sinkholes, and breccia pipes occurred throughout the region and were potential pathways for contaminants, including uranium and arsenic, to migrate through groundwater. The Report acknowledged, however, that the available data on these pathways was "sparse . . . and often limited," and that more investigation would be required fully to understand groundwater flow paths and the potential impact of uranium mining.

BLM relied heavily on the USGS Report in preparing its EIS. It used the findings of the USGS Report, as well as additional data gathered during its own two-year study, to assess the risk to five different water resources. These resources included springs and wells connected to perched aquifers; springs and wells connected to the Redwall-Muav aquifer ("R-aquifer"), the main deep aquifer within the Grand Canyon watershed[10]; and surface waters.

BLM issued a draft EIS in February of 2011; the draft EIS remained open for public comment for 75 days. Interior received over 296,339 comment submittals, from which it extracted over 1,400 substantively distinct comments. *See* Notice of Availability of the Northern Arizona Proposed Withdrawal Final Environmental Impact Statement, 76 Fed.

---

[10] The R-aquifer is the major source of groundwater within the region. It is located roughly 2,000 feet below the surface. Perched aquifers are generally much smaller and occur at much shallower levels.

Reg. 66,747, 66,748 (Oct. 27, 2011).  After reviewing these comments, Interior submitted its final EIS on October 27, 2011.

In addition to its public comment process, Interior designated several affected counties in Arizona and Utah ("the Counties") as cooperating agencies,[11] and solicited their input.[12]  Based in part on the Counties' public comments on the draft EIS, Interior requested further analysis of the anticipated economic effect of the withdrawal and consulted with county representatives.  Interior also organized five meetings with cooperating agencies, including the Counties, as well as two public meetings in the region.

The final EIS and ROD discussed four different withdrawal alternatives.  Alternative A was to take no action at all, allowing new mining claims and development to proceed unhindered.  Alternative B was to withdraw the full tract of roughly one million acres from new mining claims. Alternative C was to withdraw a substantially smaller tract of roughly 650,000 acres, which would have excluded 120,000 acres in the North Parcel outside the Grand Canyon watershed, as well as 80,000 additional acres in the North Parcel where groundwater is believed to flow away from

---

[11] The Counties comprised Garfield, Kane, San Juan, and Washington Counties in Utah, and Mohave and Coconino Counties in Arizona.

[12] Most of the Counties opposed the withdrawal because of its anticipated economic consequences.  Coconino County did not; its economy depends more on tourism than mining.  Although the area proposed for withdrawal was contained entirely within Arizona, the Utah counties' residents have an economic interest in the decision, as they stand to derive some income from uranium mining and ore processing.

Grand Canyon National Park. Alternative D was to withdraw an even smaller area, roughly 300,000 acres.

The USGS Report, final EIS, and ROD all acknowledged substantial uncertainty regarding water quality and quantity in the area, the possible impact of additional mining on perched and deep aquifers (including the R-aquifer), and the effect of radionuclide exposure on plants, animals, and humans. The USGS Report, for example, recognized that "[a] more thorough investigation of water chemistry in the Grand Canyon region is required to better understand groundwater flow paths, travel times, and contributions from mining activities, particularly on the north side of the Colorado River. The hydrologic processes that control the distribution and mobilization of natural uranium in this hydrogeologic setting are poorly understood." The ROD concluded, however, that there was sufficient data regarding dissolved uranium concentrations in the USGS Report to "inform a reasoned choice," so the missing information was not essential to its decision.

After weighing the data available, the ROD took a measured approach. It observed that a "twenty-year withdrawal will allow for additional data to be gathered and more thorough investigation of groundwater flow paths, travel times, and radionuclide contributions from mining." Because of the uncertainty regarding the movement of groundwater in the region, the ROD explained, Interior could not risk contamination of springs feeding into the Colorado River.[13] The ROD went on to explain that "the potential impacts estimated in the EIS due to the uncertainties of

---

[13] The Colorado River is the primary source of drinking water for over 26 million people.

subsurface water movement, radionuclide migration, and biological toxicological pathways result in low probability of impacts, but potential high risk. The EIS indicates that the likelihood of a serious impact may be low, but should such an event occur, significant."

The final EIS and ROD also stated justifications for the withdrawal other than the risk of groundwater contamination. The ROD noted that "mining within the sacred and traditional places of tribal peoples may degrade the values of those lands to the tribes that use them," that certain tribes believe "repeated wounding of the earth can kill their deities," and that "damage to traditional cultural and sacred places is irreversible." The ROD also observed that even if the proposed area were withdrawn in its entirety, eleven new mines could be developed during the twenty-year withdrawal period under valid existing rights. Given this potential for development of new mines, the expected rate of mining development over the ensuing twenty years would roughly match the rate of development at the time of the withdrawal. Any economic impact on local communities would thus not be severe. While recognizing that the level of mining that would go forward in the area during the withdrawal period itself posed a risk of harm, the ROD concluded that additional mining presented a significant added threat to environmental safety and could endanger wildlife and human health.

Finally, the agency stated that the "unique resources" within Northern Arizona, including the Colorado River, the Grand Canyon, and the "unique landscapes" of the region, support a "cautious and careful approach." The ROD observed that "[w]hile the lands are withdrawn, studies can be initiated to help shed light on many of the uncertainties

identified by USGS in [the USGS Report] and by BLM in the EIS."

## B. This Litigation

After the ROD issued, mining companies and local governments concerned about the economic impact of the withdrawal filed suit challenging the Secretary's action. These parties (collectively "Plaintiffs" or "Appellants")[14] filed four separate suits, one or more of which maintained (1) that section 204(c)(1) of FLPMA, 43 U.S.C. § 1714, which confers on the Secretary of the Interior the authority to make temporary large-tract withdrawals, contains an unconstitutional legislative veto provision not severable from the remainder of the subsection; (2) that the Secretary's withdrawal was arbitrary and capricious, inconsistent with the administrative record, or otherwise not in accordance with FLPMA; (3) that the Secretary failed to comply with NEPA in approving the withdrawal; (4) that the withdrawal violated the Establishment Clause of the First Amendment; and (5) that the United States Forest Service acted arbitrarily and capriciously, or contrary to law, in granting its consent to the withdrawal.

After the four cases were consolidated into a single action, Plaintiffs moved for summary judgment on the ground that the legislative veto provision within FLPMA was both

---

[14] Appellants American Exploration & Mining Association ("AEMA") and National Mining Association are organizations representing mining interests. Appellant Metamin Enterprises, USA, is a mining company. Appellant Gregory Yount is an individual who owns mining claims in the withdrawal area. Appellant Arizona Utah Local Economic Coalition is an organization representing several local governments.

unconstitutional and not severable.  As a result, Plaintiffs argued, there was no longer any statutory basis for the Secretary's twenty-year large-tract withdrawal authority. Denying the motion, the district court held the legislative veto provision unconstitutional, but severable, leaving the Secretary's challenged withdrawal authority intact.  *Yount v. Salazar*, 933 F. Supp. 2d 1215, 1243 (D. Ariz. 2013).

After discovery, the parties all cross-moved for summary judgment.  The district court granted summary judgment to Interior and Grand Canyon Trust, upholding the withdrawal against each of the plaintiffs' challenges.  The evidence in the record, particularly the USGS Report, final EIS, and ROD, supported the agency's withdrawal decision, the district court concluded, and the agency did not exceed its statutory authority under FLPMA or NEPA.  The district court also rejected the plaintiffs' Establishment Clause challenge and their claim that Interior's consultation with local counties and treatment of information gaps were inadequate under NEPA. This appeal followed.

## II.  FLPMA's Legislative Veto Provision

The Supreme Court ruled definitively in *Chadha* that Congress may invalidate an agency's exercise of lawfully delegated power in one way only: through bicameral passage of legislation followed by presentment to the President. 462 U.S. at 953–55.  FLPMA provides that Congress may invalidate a large-tract withdrawal announced by the Secretary by passing a concurrent resolution disapproving of the withdrawal within 90 days of the withdrawal's effective date; the statute does not require presentment to the President. 43 U.S.C. § 1714(c)(1).  We have little difficulty concluding

that the legislative veto provision violates the presentment requirement, a conclusion with which all parties agree.

Unlike in *Chadha*, the statutory legislative veto was not exercised by Congress in this case. Appellants maintain — and the government does not disavow — that the severability issue is nonetheless properly before us, as the Secretary's withdrawal authority *is* at issue, and that authority would fall if the legislative veto were not severable from Congress's broader delegation of power to the executive.

Although not raised by the parties, there is an argument that because Congress did not invoke the legislative veto, the provision did not injure Appellants even if constitutionally invalid, and so the Appellants lack standing to challenge either it or the withdrawal provision's continuing validity. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see, e.g.*, *United States v. City of Yonkers*, 592 F. Supp. 570, 576 (S.D.N.Y. 1984). That is, once the veto deadline passed, one could view the situation as if there were no veto available, in which case severability would not matter.

Nonetheless, we conclude that Appellants do have standing to raise the severability issue. We are presented here with an unresolvable ambiguity as to whether Congress declined to exercise its veto based on the merits of the Secretary's withdrawal or based on the veto's constitutional infirmity. Appellants' merits argument is that the withdrawal authority would not exist at all without the veto provision in place, exercised or not. Appellants' alleged injury — primarily, the inability to perfect new mining claims — is traceable to the exercise of that authority, and if their merits argument succeeded, could be redressed by invalidating the

Secretary's withdrawal authority. *Chadha*, 462 U.S. at 936. We therefore turn to that merits argument.

Invalid portions of a federal statute are to be severed "'[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.'" *Chadha*, 462 U.S. at 931–32 (quoting *Buckley v. Valeo*, 424 U.S. 1, 108 (1976)). "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (citation and internal quotation marks omitted). We must retain any portion of a statute which is (1) "constitutionally valid," (2) "capable of functioning independently" from any unconstitutional provision, and (3) "consistent with Congress' basic objectives in enacting the statute." *United States v. Booker*, 543 U.S. 220, 258–59 (2005) (citation and internal quotation marks omitted).

This general principle applies with greater force when, as here, the statute in question contains a severability clause.[15] "[T]he inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). That presumption can be overcome only by "strong evidence" that Congress intended the entire relevant portion

---

[15] Again, FLPMA provides that "[i]f any provision of this Act or the application thereof is held invalid, the remainder of the Act and the application thereof shall not be affected thereby." FLPMA § 707, 90 Stat. at 2794.

of the statute to depend upon the unconstitutional provision. *Id*.

That the offending portion of FLPMA is a legislative veto provision further strengthens the severability presumption. There is an obvious substitute for the legislative veto: the ordinary process of legislation. Nothing (except the need to muster sufficient votes) prevents Congress from revoking a large-tract withdrawal by passing legislation vacating the withdrawal, presenting the proposed legislation to the President, and (if necessary) overriding the President's veto. Notably, none of the Appellants have cited any case holding that a legislative veto provision could not be severed where the statute in question contained a severability clause, nor have we found one.[16]

Moreover, the language and structure of FLPMA and the legislative history underlying the statute do not provide the requisite "strong evidence" that the Secretary's authority to make large-tract withdrawals rises and falls with Congress's veto power over those withdrawals. To the contrary, the

---

[16] *Western States Medical Center v. Shalala*, 238 F.3d 1090 (9th Cir. 2001) is not a contrary example. We noted in *Western States Medical Center* that the inclusion of a severability clause in the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–397, did not suggest that an unconstitutional provision of a *subsequent* amendment to that statute, the Food and Drug Administration Modernization Act of 1997 ("FDAMA"), 21 U.S.C. § 353a, was severable from the remainder of the FDAMA. "Because Congress approved this severability clause *before* FDAMA's passage," we held, "it is less compelling evidence of legislative intent than a clause enacted simultaneously with FDAMA. Congress may have intended the original provisions of the FDCA to be severable, but meant for FDAMA's provisions to stand or fall together." *W. States Med. Ctr.*, 238 F.3d at 1097–98. Here, the relevant provisions of FLPMA were enacted simultaneously with the severability clause.

limited delegation of large-tract withdrawal authority is fully
"consistent with Congress' basic objectives" in enacting
FLPMA even if there is no legislative veto option. *Booker*,
543 U.S. at 259.

First, Congress in FLPMA imposed significant limitations
on the Secretary's withdrawal authority and provided for
congressional oversight over executive withdrawals by means
other than the legislative veto. For example, Congress
reserved to itself the exclusive authority to make *permanent*
large-tract withdrawals, limiting the Secretary's large-tract
withdrawals to no more than twenty years. 43 U.S.C.
§ 1714(c)(1). Although large-tract withdrawals can be
renewed after the twenty-year term expires, the twenty-year
term ensures that the renewal decision would necessarily have
to be made by a different presidential administration and,
almost surely, a different Secretary of the Interior.

Congress in FLPMA also limited the Secretary's power
to delegate withdrawal authority to subordinates, restricting
that delegation to officers appointed by the President and
confirmed by the Senate. 43 U.S.C. § 1714(a). And for
large-tract withdrawals, FLPMA requires not only that the
Secretary provide timely notice to Congress (enabling
Congress to address the proposed withdrawal legislatively if
it so chooses), but mandates that the Secretary issue a detailed
report addressing twelve specific issues of concern.
43 U.S.C. § 1714(c)(2).[17] The statute also delineates specific
requirements for public hearings concerning proposed
withdrawals and requires publication in the Federal Register

---

[17] *See supra* note 6.

of such proposals. 43 U.S.C. § 1714(b), (h).**[18]** The plethora of constraints on the Secretary's large-tract withdrawal authority — all of which remain in place — confirms that the legislative veto provision was only one of many provisions enacted to advance Congress's broad oversight of the Secretary's withdrawal decisions. Severing the legislative veto provision would leave the remaining limitations, and opportunity for congressional oversight and involvement, in place.

The legislative history underlying FLPMA confirms this conclusion. As the district court observed, the PLLRC Report, on which Congress relied in passing FLPMA, was "equally concerned with enabling the Executive to act through controlled delegation as it was with preserving Congress's reserved powers." *Yount*, 933 F. Supp. 2d at 1223. For example, the Report recommended, without mention of a legislative veto, that Congress "delineat[e] specific delegation of authority to the Executive as to the types of withdrawals and set asides that may be effected without legislative action." PLLRC Report, at 2. And the Report recommended that all withdrawal authority other than

---

[18] Regarding public hearings, FLPMA provides that "[a]ll new withdrawals made by the Secretary under this section (except an emergency withdrawal . . . ) shall be promulgated after an opportunity for a public hearing." 43 U.S.C. § 1714(h). Regarding publication, FLPMA provides that "[w]ithin thirty days of receipt of an application for withdrawal, and whenever he proposes a withdrawal on his own motion, the Secretary shall publish a notice in the Federal Register stating that the application has been submitted for filing or the proposal has been made and the extent to which the land is to be segregated while the application is being considered by the Secretary. . . . The segregative effect of the application shall terminate upon (a) rejection of the application by the Secretary, (b) withdrawal of lands by the Secretary, or (c) the expiration of two years from the date of the notice." 43 U.S.C. § 1714(b)(1).

"large scale limited or single use withdrawals of a permanent or indefinite term" be "expressly delegated." *Id.* at 55.

Similarly, the House Report identified among the primary objectives of the legislation both establishing "procedures to facilitate Congressional oversight of public land operations entrusted to the Secretary of the Interior," and endowing BLM with "sufficient authority to enable it to carry out the goals and objectives established by law for the public lands under its jurisdiction." H.R. Rep. 94-1163, at 2 (1976). The House Report discussed the legislative veto only in the context of several other mechanisms for congressional oversight and limitations on the Secretary's authority: the notice and reporting requirements, the limits on delegation, the consent requirement, the hearing requirement, and the temporal limitation. *Id*. at 9–10.

Nor does the Conference Report suggest that the legislative veto was an essential component of the legislation. That Report referenced the legislative veto only in the context of delineating where the House bill (ultimately adopted) diverged from the Senate bill.[19] And although several Members of Congress emphasized in their floor statements the importance of the bill's oversight provisions during the floor debates,[20] many other members, including several who

---

[19] The Senate bill did not include a legislative veto. *See* H.R. Rep. No. 94-1724, at 57 (1976) (Conf. Rep.), 1976 U.S.C.C.A.N. 6227, 6229.

[20] Rep. Samuel Steiger stated that "[t]here were those of us — and I include myself — who felt that the Secretary should have the opportunity of making no withdrawals without the review of Congress," and that granting small-tract withdrawal authority "already represent[s] a very strong compromise." 122 Cong. Rec. 23,451 (1976). Rep. Joe Skubitz stated that it was essential that Congress "be . . . able to oppose[,] if

voted *for* the legislation, expected the legislative veto to prove overly burdensome for Congress.[21]

At best, the legislative history of FLPMA is inconclusive as to whether a majority of the House would have opposed delegating large-tract withdrawal authority without the legislative veto.  As with most legislation, FLPMA's legislative veto provision represented a compromise between groups of lawmakers with divergent and sometimes competing interests.  It is possible — perhaps even likely — that had Congress known in 1976 that the legislative veto provision was unconstitutional, a somewhat different legislative bargain would have been struck.  Congress might, for example, have shortened the twenty-year term for

---

necessary, withdrawals which it determines not to be in the best interests of all the people." *Id*. at 23,437. Rep. John Melcher, the chief sponsor of the legislation in the House, stated that the veto was a component of the bill's general objective of adding "congressional oversight responsibility" to land management. *Id.* at 23,452. He stated that "[s]ince there is now no system of congressional review and congressional oversight of withdrawals, [the legislative veto provision] is the first positive step that Congress has taken to . . . exercise that responsibility." *Id*. But Rep. Melcher also opined on the House floor, somewhat in contradiction, that the bill would "not in any way limit or interfere with" the Secretary's authority to make withdrawals. *Id.* at 23,453.

[21] Rep. John Seiberling called the congressional oversight provisions "[some] of the most objectionable provisions in the legislation." 122 Cong. Rec. 23,436.  Rep. Patsy Mink opposed several of the limitations on the Secretary's withdrawal discretion, believing, as Rep. Seiberling did, that the legislation would place an unworkable burden on both Congress and the Department of the Interior. *Id*. at 23,438. The Conference Report adopted the House's version of the bill with respect to the Secretary's withdrawal authority but barely discussed the legislative veto. H.R. Rep. No. 94-1724.

temporary withdrawals, or decreased the acreage required to trigger FLPMA's large-tract withdrawal provisions.

But the question before us is not whether Congress would have drafted the statute differently in the absence of the unconstitutional provision. The question is whether "the statute's text or historical context makes it evident that Congress . . . would have preferred no statute at all." *Hamad. v. Gates*, 732 F.3d 990, 1001 (9th Cir. 2013) (internal quotation marks omitted); *see Free Enter. Fund*, 561 U.S. at 481; *Alaska Airlines*, 480 U.S. at 685–86. Given the recognized desire for executive authority over withdrawals of federal lands from new mining claims — and given Congress's preference regarding survival of that authority, as expressed in the severability clause — there is no indication, let alone "strong evidence," *Alaska Airlines*, 480 U.S. at 686, that Congress would have preferred "no statute at all" to a version with the legislative veto provision severed. As in *Chadha*, "[a]lthough it may be that Congress was reluctant to delegate final authority . . . , such reluctance is not sufficient to overcome the presumption of severability raised by [a severability clause]." 462 U.S. at 932.

Notably, given FLPMA's notice and report provision, Congress has the opportunity to pass timely and informed legislation reversing any withdrawal — legislation that would then be submitted for presidential approval (or veto, followed by a potential override). Since the passage of FLPMA, the Secretary has exercised large-tract withdrawal authority 82 times without Congress ever attempting to override that

authority.**[22]**  *See* Interior-SER 637–38.  Nor, since *Chadha* was decided more than three decades ago, has Congress amended the relevant section of the statute to enhance congressional oversight or limit the Secretary's withdrawal authority.  That history further undermines the Appellants' contention that the legislative veto was an essential and indispensable component of FLPMA without which Congress would never have delegated large-tract withdrawal authority.

Appellants make one final, technical argument in support of severability: They observe that the legislative veto provision is contained entirely within the subsection of the statute delegating large-tract withdrawal authority to the Secretary, section 204(c)(1) of FLPMA.  Appellants propose that the legislative veto and the delegation of large-tract withdrawal authority are therefore part of the same "provision."  As the statute's severability clause mandates severance of any unconstitutional "provision," Appellants contend, the entirety of section 204(c)(1) must be severed.  Not so.

There is no support for the proposition that a statutory subsection, like section 204(c)(1), is the smallest unit that can be characterized as a "provision" subject to a severability clause.  And no reason occurs to us why a sentence within a subsection is not a "provision" of the statute.  *See* Black's Law Dictionary 1420 (10th ed. 2014) (defining "provision"

---

**[22]** *See, e.g.*, California: Withdrawal for New Melones Dam and Reservoir Project, 44 Fed. Reg. 70,467 (Dec. 7, 1979); Certain Lands in Alaska: Public Land Order Withdrawals, 45 Fed. Reg. 9,562 (Feb. 12, 1980); New Mexico: Withdrawal of Lands, 45 Fed. Reg. 29,295 (May 2, 1980); Idaho: Withdrawal of Snake River Birds of Prey Area, 45 Fed. Reg. 78,688 (Nov. 26, 1980); Oregon: Withdrawal of Lands for Diamond Craters Geologic Area, 46 Fed. Reg. 6,947 (Jan. 22, 1981).

as "clause"). Indeed, courts have severed legislative vetoes within single sentences. *See Alabama Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300, 1306–08 (11th Cir. 2002) (severing a dependent clause containing a legislative veto from a statutory subsection because that clause was an unconstitutional "provision"). Were we to accept Appellants' argument, the result would be to require courts to sever *more* of a statute that contains a severability clause referring to a "provision" than one that does not. Absent a clear command, we cannot imagine that Congress intended such a peculiar result.

We therefore hold that the unconstitutional legislative veto embedded in section 204(c)(1) of FLPMA is severable from the large-tract withdrawal authority delegated to the Secretary in that same subsection. Invalidating the legislative veto provision does not affect the Secretary's withdrawal authority.

## III. FLPMA

### A. Appellants' FLPMA Claims

We turn next to the merits of the FLPMA claims. We review challenges to agency actions such as those here under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA, a reviewing court may set aside only agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotation marks

omitted). A court may not "substitute its judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977), and an agency's interpretation of its organic statute, as well as of its own regulations, is entitled to deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *Auer v. Robbins*, 519 U.S. 452, 461–63 (1997).

The ROD listed four rationales for the withdrawal: (1) It would protect water resources in the Grand Canyon watershed and the Colorado River from possible contamination; (2) it would preserve cultural and tribal resources throughout the withdrawn area; (3) it would protect natural resources, including wildlife and wilderness areas; and (4) because existing claims could still be mined, the economic benefits of uranium mining could still be realized by local communities. Appellants challenge each of the Secretary's rationales for the withdrawal,[23] but focus on the first. Appellants contend that the final EIS and ROD exaggerated the risk of water contamination from uranium mining in the affected area, and that the administrative record

---

[23] AEMA maintains that the Secretary was precluded from proposing any additional rationales for the withdrawal in the ROD beyond the primary justification stated in BLM's 2009 application for the withdrawal — the potential threat to groundwater in the Grand Canyon watershed. AEMA contends that the additional justifications rendered the Secretary's decision arbitrary and capricious because they allegedly violated regulations "requir[ing] the Secretary to make a determination based on the application for withdrawal." But nothing in FLPMA or its implementing regulations requires that the scope of the ROD be limited to the purposes stated in the initial application for the withdrawal. Indeed, it would defeat the very purpose of allowing public comment on a proposed withdrawal if the Secretary were unable to incorporate new evidence or concerns raised by commenters into his decisionmaking.

suggests that existing laws and regulations were sufficient to achieve the aim of water protection.

### 1.  Potential Impact on Water Resources

The crux of Appellants' FLPMA argument is that the scientific evidence in the record does not justify the Secretary's decision to withdraw this large tract of land to protect water resources.  In support, Appellants characterize several segments of the final EIS, ROD, and administrative record as indicating that the risk of groundwater contamination from uranium mining was low and the scientific rationale for the withdrawal weak.

Congress defined the Secretary's "withdrawal" power as the power to withhold federal lands from mining or settlement, "in order to maintain other public values in the area or reserv[e] the area for a particular public purpose or program."  43 U.S.C. § 1702(j).  The terms "public values" and "public purpose" are not defined in the statute.

Congress's stated objectives in enacting FLPMA provide clues to the meaning of those words.  Congress's objectives included ensuring that "the public lands [would] be managed in a manner that [would] protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, [would] preserve and protect certain public lands in their natural condition; that [would] provide food and habitat for fish and wildlife and domestic animals; and that [would] provide for outdoor recreation and human occupancy and use."  43 U.S.C. § 1701(a)(8).  That broad

language encompasses the Secretary's justifications for the withdrawal here challenged.[24]

The USGS Report and the final EIS establish that Interior did have evidence that additional uranium mining could present a risk of contamination. The USGS Report analyzed over 1,000 water samples from 428 different locations within the region, and found that 70 sites exceeded the EPA's primary or secondary heavy metal contaminant levels. Samples from fifteen springs and five wells indicated uranium concentrations exceeding the EPA's maximum contaminant levels. The USGS Report acknowledged that the evidence was "inconclusive" regarding a connection between those findings and mining activity, but could not rule out such a connection.

The final EIS and ROD further indicate that the full-withdrawal alternative was expected to reduce substantially the potential environmental impact from continued mining operations. The final EIS concluded that under Alternative A ("no action") the projected water quality impact to R-aquifer

---

[24] Metamin contends that "FLPMA limits the Secretary's authority to withdraw lands to instances when the proposed use *will* cause environmental degradation or where existing and potential uses *are* incompatible with or [in] conflict with the proposed use" (emphases added). The section of the statute Metamin cites concerns the requirements for the Secretary's report to Congress, not the basis of the Secretary's authority to make a withdrawal. *See* 43 U.S.C. § 1714(c)(2). The contents of the Secretary's report to Congress are not subject to judicial review. *See* FLPMA § 701(i), 90 Stat. at 2786 (codified at notes to 43 U.S.C. § 1701). Moreover, the section says "might" cause environmental degradation, not "will." 43 U.S.C. § 1714(c)(2)(2). Metamin's argument thus rests on a misapplication, a misreading, and, in part, an erroneous paraphrasing of the statute. Uses can undoubtedly be incompatible based on *risk* of harm rather than the certainty of it.

springs was "none to moderate" in the entirety of the North Parcel and East Parcel, and "none to major" for part of the South Parcel; the anticipated impact was "none to negligible" only for two springs in the South Parcel. The potential impact on surface water quality was assessed as at least "negligible to moderate" in all three parcels under Alternative A. Under Alternative B (the full withdrawal), the final EIS assessed the risk to water quality as "negligible to moderate" *only* for surface waters in the North Parcel, and "none to major" *only* for R-aquifer wells in the South Parcel.

The final EIS, the USGS Report, and the ROD acknowledge considerable uncertainty regarding whether and how mining contributes to groundwater contamination in the Grand Canyon watershed. The USGS Report, for example, found that "[t]he hydrologic processes that control the distribution and mobilization of natural uranium in this hydrogeologic setting are poorly understood," and that available information regarding any correlation between mining and groundwater contamination was "limited and inconclusive." Both the final EIS and the ROD recognized that the risk to water quality in the R-aquifer was likely low, but that significant uncertainty existed regarding travel times and hydrogeologic conditions within particular breccia pipes. In both documents, Interior observed that the Bureau would benefit from continued study, which a temporary withdrawal would allow.

But after acknowledging the uncertainties and need for further study, the ROD concluded that unfettered mining presented a small but significant risk of dangerous groundwater contamination — a risk that would be substantially mitigated by the withdrawal. The final EIS supports this conclusion.

Some analysts within the Department of the Interior disagreed. They believed the scientific data presented in the EIS insufficient to justify the withdrawal.[25] But the existence of internal disagreements regarding the potential risk of contamination does not render the agency's ultimate decision arbitrary and capricious. Scientific conclusions reached by the agency need not reflect the unanimous opinion of its experts. "[A] diversity of opinion by local or lower-level agency representatives will not preclude the agency from reaching a contrary decision, so long as the decision is not arbitrary and capricious and is otherwise supported by the record." *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1186–87 (10th Cir. 2013); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658–59 (2007).

Again, we must uphold the agency's choice so long as it is "supported by reasoned analysis." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 665 (9th Cir. 2009). The record demonstrates that the Secretary conducted a carefully reasoned analysis, considered the available scientific data, weighed diverse opinions from Interior experts and public commenters, recognized the limitations of the available scientific evidence, and concluded that a cautious approach was necessary to forestall even a low probability of contamination in excess of EPA thresholds — thresholds developed in response to serious concerns about human health. *See* 65 Fed. Reg. 76,708. The Secretary stressed that

---

[25] In particular, some BLM employees expressed skepticism about withdrawal of the 120,000 acres outside the Grand Canyon watershed. One analyst stated via email that he "ha[d] not seen any written criteria which justif[y] the withdrawal" for that portion of the tract. Another observed that large areas within the North Parcel "have low resource value" and recommended that the agency consider excepting them from the withdrawal.

the withdrawal was not permanent, affording the opportunity to collect additional data about the hydraulic patterns in the area and the impact of uranium mines on water resources. We cannot say that the withdrawal decision was arbitrary, capricious, or not in accordance with the law.

## 2.  Cultural and Tribal Resources

Appellants next contend that the Secretary lacked the authority to withdraw such a large tract of land for the purpose of protecting cultural or tribal resources, and that even if it had the authority, it acted arbitrarily and capriciously in exercising it.  We do not agree with either proposition.

FLPMA permits the Secretary to premise a withdrawal of public lands from new mining claims on the protection of cultural and tribal resources.  The congressional policy statement included in FLPMA contemplates that Interior will manage public lands in part for the protection of "historical" and "archaeological" values.  43 U.S.C. § 1701(a)(8). Consistent with that mandate, Interior's regulations require that an EIS, prepared in compliance with NEPA, include a full report on "the identification of cultural resources" possibly impacted by agency action.  43 C.F.R. § 2310.3-2(b)(3)(I).

Appellants argue that the withdrawal was overbroad because it was not "based on particular sites or sacred areas," but rather covers a large tract of federal land that includes multiple sites.  But the final EIS explained that the withdrawn area as a whole is of profound significance and importance to Native American tribes.  The entirety of the North and East Parcels falls within the traditional territory of the Southern

Paiute, while the Southern Parcel is a traditional use area for the Navajo, the Hopi, the Hualapai and the Havasupai tribes. Many tribes, including the Hopi, view the whole territory as sacred and regard any drilling and mining as inflicting irreparable harm. Moreover, the final EIS also identified a host of specific sites, trails, hunting areas, springs, and camps which are of traditional importance to several tribes and are cultural and archeological treasures in their own right.

Nothing in FLPMA or our case law indicates that the Secretary may not withdraw large tracts of land in the interest of preserving cultural and tribal resources. Nor is there any reason to believe that a withdrawal must be restricted to narrow carveouts tracing the perimeter of discrete cultural and historical sites, as opposed to a larger area containing multiple such sites.[26] Courts have previously upheld large-

---

[26] Metamin and AEMA contend that the Secretary's independent decision to withdraw large tracts of federal lands from mining based in part on the protection of tribal resources essentially grants the tribes veto power over mining on traditional tribal lands. That argument rests on an erroneous reading of our case law. Metamin cites a line of cases in which we have held that Native American tribes could not block a federal agency's approval of mining or other commercial activities on large tracts of particular cultural or religious value to the tribes. *See S. Fork Band Council of W. Shoshone Indians of Nev. v. U.S. Dep't of the Interior*, 588 F.3d 718, 724 (9th Cir. 2009); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070–74 (9th Cir. 2008) (en banc); *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1484–86 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991). Those cases hold that federal agencies are not *compelled* to withdraw large tracts of public land from particular uses because of the potential impact on tribal resources. Nothing in our case law suggests that an agency is barred from doing so based on its own judgment. To the contrary, those cases reaffirm the federal government's right to make what it deems to be appropriate use of its land. *See Navajo Nation*, 535 F.3d at 1072 (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451–53 (1988)).

tract withdrawals justified in part by the protection of tribal resources and "areas of traditional religious importance to Native Americans." *See, e.g.*, *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 752 (D.C. Cir. 2007).

### 3. Other Resources

Appellants also challenge the Secretary's third reason for the withdrawal: to protect "other resources," including visual resources and wildlife. This challenge fails as well.

The record supports the conclusion that there would be a significant impact on visual resources and a risk of significant harm to wildlife absent the withdrawal. The final EIS concluded that if new mining claims proliferated, the impact on visual resources would range from minor to major, depending on the area, but would likely be "moderate" overall. The ROD found that mining-related emissions, dust, and haze would be dramatically higher absent the withdrawal, with a consequent risk to air quality and visibility. Although some of the effects of increased uranium mining — such as the effects of increased levels of radionuclides on wildlife — were unknown or difficult to project, the final EIS concluded that the relative impact of mining on wildlife would be "significantly less" if the proposed area were withdrawn. Fewer roads and power lines would be built, and trucking would be significantly decreased. And the final EIS explained that even a minimal degree of water contamination could have considerable impact on aquatic species.

### 4. Economic Benefits

Appellants propose that Interior violated both FLPMA and NEPA by miscalculating the amount of uranium in the

withdrawn area and thus failed accurately to weigh the economic impact of the withdrawal. Specifically, Appellants argue that the USGS Report used outdated information from a 1990 USGS study, and that BLM failed to account for "hidden" breccia pipes (pipes not exposed above ground) in its analysis of the economic impact of precluding new mining claims. Appellants proffer their own analyses of the quantity of uranium in the withdrawn area, which they project to be five times larger than the USGS Report's estimate of 162,964 tons. These challenges fail for several reasons.

First, Appellants offer no basis for concluding that the methodology of the 1990 Report was unsound. Further, the 2010 USGS Report did not in fact incorporate the 1990 Report wholesale. It incorporated some of the findings of the 1990 Report, but made several adjustments and recalculations in a peer-reviewed update. The 2010 Report also relied on several peer-reviewed papers published before and after the 1990 Report, including one authored by an expert, Karen Wenrich, who opposed the withdrawal.

Additionally, BLM reviewed and reasonably responded to Appellants' proposed alternative calculations, made in comments on the proposed withdrawal. The agency concluded that the alternative proposals had not been sufficiently developed or peer-reviewed and so declined to accord them significant weight. With regard to Appellants' contention that BLM failed to account for "hidden" breccia pipes in its economic analysis, BLM stated in response to NMA's public comments that those pipes were in fact incorporated into BLM's numerical estimates.

In sum, the agency's findings regarding the quantity of uranium in the withdrawn area were not arbitrary or

capricious, as the agency relied on peer-reviewed data and reasonably explained why it did not adopt Appellants' alternative version.

## B. Boundaries

Opening up another front, Appellants maintain that two subsections of the withdrawn area — roughly 120,000 acres in the western section of the North Parcel, which are part of the Virgin River watershed rather than the Grand Canyon watershed, and an additional 80,000 acres in the northeast section of the North Parcel, where groundwater is believed to flow away from the Colorado River and Grand Canyon National Park — should not have been included even if the withdrawal was otherwise proper (which, of course, they dispute). Observing that the withdrawn area has essentially the same boundaries included in Rep. Grijalva's unsuccessful legislation, Appellants contend that the Secretary did not make an independent determination that withdrawal of those discrete areas was merited. Inclusion of those 200,000 acres, Appellants maintain, is inconsistent with both (1) the stated purpose of the withdrawal as expressed in the BLM's 2009 application for the withdrawal (to protect "the Grand Canyon watershed"), and (2) the guidance of Interior manuals directing that withdrawals "be kept to a minimum consistent with the demonstrated needs of the applicants."[27] Department of the Interior, 603 DM 1.1(A) (Aug. 1, 2005).

The principal flaw in this partial challenge is that protection of the Grand Canyon watershed was not the only

---

[27] We note that Interior's manuals do not carry the force of law and are not binding. *McMaster v. United States*, 731 F.3d 881, 888–89 (9th Cir. 2013).

basis for the withdrawal. As the district court noted, the three other bases for the withdrawal are fully applicable to the disputed 200,000 acres. In particular, in including the North Parcel in the withdrawal area, Interior relied not just on water or air contamination, but also on the anticipated impact mining would have on wildlife, cultural, tribal, and visual resources.

For example, BLM observed in the final EIS that the "no action" alternative could increase wildlife mortality and reduce viability — particularly across the North Parcel — due to "noise and visual intrusions," the development of new roads and power lines, and "chemical and radiation hazards." The final EIS also observed that several tribes considered some or all of the North Parcel an ancestral homeland with significant cultural value. The entire North Parcel overlaps with Southern Paiute band territories, which, according to a University of Arizona ethnographic report commissioned by Grand Canyon National Park and cited in the final EIS, "remain important in the cultural life and history of Southern Paiute tribes."

Alternative C would not have withdrawn areas "with isolated or low concentrations of [biological] resources" that could be adversely affected by mineral exploration and development, such as the area outside the Grand Canyon watershed. But the final EIS considered and rejected Alternative C because it still risked a number of adverse consequences. Interior anticipated a harmful impact to wildlife under Alternative C — though of a lesser magnitude — as well as a "very high" potential for disturbance "of places of cultural importance to American Indians within the

North Parcel."[28]  Full withdrawal had "the greatest potential of all alternatives . . . to not change the existing wilderness characteristics."

The upshot is that arguments concerning the disputed 200,000 acres (and Alternative C) are myopically — and, so, incorrectly — focused solely on an asserted disconnect between that area and the Grand Canyon watershed.  The Department of the Interior's assigned role is administering public lands in a manner "that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).  That responsibility goes well beyond particular groundwater areas or watersheds.  The Secretary appropriately included the full North Parcel in the withdrawal area after considering all relevant environmental and cultural impacts.  The decision to do so was not arbitrary and capricious.

Importantly, we note also that although Interior's analysts concluded that the hydrological basis for withdrawing the disputed 200,000 acres was not especially strong, they also observed that, within that acreage, underground fault zones conveyed some groundwater "south toward the Grand Canyon."[29]  Interior's cautious assessment of the possible

---

[28] The northeast and west portions of the North Parcel include several specific sites of cultural significance identified in the final EIS, albeit fewer than the rest of the North Parcel.

[29] For example, a National Parks Service hydrologist, Larry Martin, stated in an internal email that "[t]he [draft EIS] goes to great lengths in an attempt to establish impacts to water resources from uranium mining. It fails to do so, but instead creates enough confusion and obfuscation of hydrogeologic principles to create the illusion that there could be adverse

impact of any groundwater contamination in the North Parcel reflected the agency's recognition that the hydrology of the North Parcel was not particularly well studied or understood.

## C. Multiple-Use Mandates

Somewhat opaquely, Appellants raise yet another challenge to the Secretary's withdrawal decision — that it contravened the principle that land management under FLPMA "be on the basis of multiple use and sustained yield." 43 U.S.C. § 1701(a)(7). This argument lacks merit.

FLPMA defines "multiple use" as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people," and specifically contemplates "the use of some land for less than all of the resources" and the long-term preservation of "natural scenic, scientific and historical values." 43 U.S.C. § 1702(c). Accordingly, FLPMA cautions the Secretary to give consideration to "the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." *Id.*

As the Supreme Court has observed, "multiple use" is a "deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). It does not, as

---

impacts if uranium mining occurred." Martin's manager, Bill Jackson, observed that "the hard science doesn't strongly support a policy position," but also observed that the prevailing uncertainty as to the risk of contamination was itself a possible reason for withdrawal.

Appellants suggest, require the agency to promote one use above others.  Nor does it preclude the agency from taking a cautious approach to assure preservation of natural and cultural resources.   The agency must weigh competing interests and, where necessary, make judgments about incompatible uses; a particular parcel need not be put to all feasible uses or to any particular use.  *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 710 (10th Cir. 2009).  Consequently, the principle of multiple use confers broad discretion on an implementing agency to evaluate the potential economic benefits of mining against the long-term preservation of valuable natural, cultural, or scenic resources.

Here, Interior engaged in a careful and reasoned balancing of the potential economic benefits of additional mining against the possible risks to environmental and cultural resources.  This approach was fully consonant with the multiple-use principle.

## D.  Sufficiency of Existing Laws and Regulations

Launching yet another line of attack, Metamin and AEMA maintain that the Interior did not adequately consider whether existing laws and regulations were sufficient to protect the resources identified in the ROD, undermining the justification for the withdrawal.  Alternatively, and to some degree in contradiction, Metamin and AEMA represent that Interior found existing laws and regulations sufficient but did not draw the proper conclusion — that withdrawal was unjustified.  Neither argument is persuasive.

The final EIS repeatedly acknowledged that some applicable laws and regulations mitigate the impact of

uranium mining on environmental, cultural, and visual resources, as well as wildlife and human health. But the final EIS does not suggest that simply enforcing existing laws and regulations would suffice to meet the purposes of the withdrawal.

For example, the final EIS examined the relative impacts of Alternative A (wherein the agency would take no action and existing laws and regulations would be left in place) and Alternative B (the full withdrawal) at great length. The final EIS concluded that the potential negative impact on water resources would be significantly greater under Alternative A, a comparison that expressly accounted for the applicable regulatory schemes. With respect to cultural and tribal resources, the final EIS concluded that (1) under the existing regulatory regimes, "it may not be possible to reduce all such adverse effects in the long term, especially impacts to the character, association and feeling of the setting"; (2) mitigation of the expected damage to tribal resources, in particular, "may be difficult or impossible in many cases"; and (3) "the preferred mitigation method is avoidance." Limiting the withdrawal to 600,000 acres — still a sizeable area — would, the final EIS concluded, have resulted in a "very high" impact on cultural and tribal resources. With respect to wildlife and visual resources, the final EIS's comparison of Alternatives A and B demonstrated that the existing regulatory scheme would be "significantly" less effective without the withdrawal, and that taking no action would result in a moderate impact on those resources.

In short, the final EIS did take existing legal regimes into account but reasonably concluded that they were inadequate to meet the purposes of the withdrawal.

### IV.  The Establishment Clause

Appellant Gregory Yount alone challenges the Secretary's withdrawal as violating the Establishment Clause of the First Amendment.

The Secretary observed in the ROD that uranium mining "within the sacred and traditional places of tribal peoples may degrade the values of those lands to the tribes that use them." According to Yount, precluding new mining claims on federal land out of concern that the area has sacred meaning to Indian tribes violates the Establishment Clause.

In general, state action does not violate the Establishment Clause if it (1) has a secular purpose, (2) does not have a principal or primary effect of advancing or inhibiting religion, and (3) does not foster excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).  The withdrawal easily satisfies this test.

Preservation of "cultural and tribal resources" was one of four rationales for the withdrawal identified in the ROD.  And although some of the tribal resources in question had sacred meaning and uses for tribe members, many did not.  The final EIS identified "sacred sites" as just one of several varieties of important tribal resources: others included "tribal homelands, places of traditional importance, traditional use areas, trails, springs and waterways."  Accordingly, as just part of four reasons for action, preserving tribes' religious use of disputed lands was neither a motivating purpose for nor a principal or primary effect of the withdrawal.

Furthermore, preservation of areas of cultural or historic value area may constitute a "secular purpose" justifying state

action even if the area's significance has, in part, a religious connection. *See Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1043–44 (9th Cir. 2007). California's missions, Alaska's Russian-era Orthodox churches, and Ancient Hawaii's heiau carried religious significance to those who built them, and may carry religious connotations to some of those who visit today. So, too, "the National Cathedral in Washington, D.C.; the Touro Synagogue, America's oldest standing synagogue, dedicated in 1763; and [the] numerous churches that played a pivotal role in the Civil Rights Movement, including the Sixteenth Street Baptist Church in Birmingham, Alabama." *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 976 (9th Cir. 2004). "[B]ecause of the central role of religion in human societies, many historical treasures are or were sites of religious worship." *Id.* But that does not negate the value of these sites as a part of our secular cultural inheritance. The American Indian sacred land at issue here is no different.[30] *Access Fund*, 499 F.3d at 1044–45; *Cholla Ready Mix*, 382 F.3d at 976. For that reason as well, the withdrawal had a secular purpose and did not have as a primary effect advancing religion.

Finally, there is no colorable contention that the Secretary's withdrawal fosters "excessive government

---

[30] Yount's reliance on *Lyng v. Northwest Indian Cemetery Protective Association* is misplaced for much the same reason as Metamin's and AEMA's reliance on the *Lyng* line of cases. *See supra* note 26. *Lyng* held that the Free Exercise Clause did not compel the government to defer to tribal religious interests when managing public land. 485 U.S. at 453–54. It in no way held that the Establishment Clause compelled the government to *disregard* tribes' interests in their sacred sites. *See, e.g.*, *id.* at 454 ("The Government's rights to the use of its own land . . . need not and should not discourage it from accommodating religious practices like those engaged in by the Indian respondents.").

entanglement with religion." *Lemon*, 403 U.S. at 613. Yount has suggested that a withdrawal premised on the protection of areas associated with "archaic religious dogma" that "few currently follow" somehow inserts the federal government into a debate over American Indian religious life. But again, even with respect to tribal resources, the reasons for and effect of the Secretary's withdrawal were primarily secular. The withdrawal in no way "involves comprehensive, discriminating, and continuing state surveillance of religion." *Nurre v. Whitehead*, 580 F.3d 1087, 1097 (9th Cir. 2009) (citation omitted). Nor is there any evidence that it "divides citizens along political lines" for reasons related specifically to American Indian religious practice. *Id.* at 1097 (citation omitted); *see Lemon*, 403 U.S. at 622. Thus, the Establishment Clause challenge fails under *Lemon*.

## V. NEPA

### A. Essential Information

Appellants also contend that the final EIS regarding the withdrawal violated NEPA. Appellants propose, first, that by ignoring missing data essential to its analysis, BLM failed to consider an important aspect of the problem facing the agency. We do not agree.

The EIS is "[t]he centerpiece of environmental review . . . , in which the responsible federal agency describes the proposed project and its impacts, alternatives to the project, and possible mitigation for any impacts." *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016). NEPA's implementing regulations require that "[w]hen an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an

environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking." 40 C.F.R. § 1502.22. When that information is deemed "essential to a reasoned choice among alternatives," the agency must either obtain it or, if the information is not obtainable, include in the EIS (1) a statement identifying relevant unavailable or incomplete information; (2) a discussion of the relevance of that information to potential environmental impacts; (3) a summary of the available credible scientific evidence which is relevant to evaluating foreseeable environmental impacts; and (4) the agency's evaluation of those impacts based upon generally accepted scientific approaches. 40 C.F.R. § 1502.22(a), (b); *see Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 497 (9th Cir. 2014) (holding that the steps specified by § 1502.22(b) are required if the agency finds "'essential' information to be unobtainable").

Here, the final EIS fully abided by these regulatory requirements. The final EIS consistently acknowledged that information was incomplete with respect to a critical aspect of the withdrawal — namely, the connection between uranium mining and increased uranium concentrations in groundwater in the withdrawn area. The document included several subsections titled "Incomplete or Unavailable Information," which discussed the relevance of that missing information to its analysis. For example, BLM acknowledged in the final EIS that "more precise information on the locations of exploration sites, mine sites, and roads would be useful to better understand the . . . impacts to wildlife and fish species," and that "[a] more thorough quantitative data investigation of water chemistry in the Grand Canyon region would be helpful to better understand groundwater flow paths, travel times, and contributions from mining activities."

As required, the EIS then summarized the scientific evidence that *was* available and discussed foreseeable environmental impacts.

Furthermore, the ROD concluded that the missing information was not "essential to making a reasoned choice among alternatives." 40 C.F.R. 1502.22. The ROD observed that there was data regarding dissolved uranium concentrations near six previously mined sites, and that a reasoned choice could be made using that data. The ROD stated that collecting additional data would be "helpful for *future* decisionmaking in the area" (emphasis added). But as the withdrawal was not permanent and would apply only to new mining claims, the ROD noted, additional data could be collected during the withdrawal period and used to determine whether additional mines should be allowed in the future.

Interior expressly stated that the missing information was non-essential only in the ROD, not in the final EIS. We agree with the Seventh and Tenth Circuits that an agency is not required to state specifically in the final EIS that relevant missing information was non-essential. "[NEPA's implementing] regulations do not prescribe the precise manner through which an agency must make clear that information is lacking." *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 532 (7th Cir. 2012); *see also Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172–73 (10th Cir. 1999). As the final EIS complied with the requirements for *essential* information, thereby ensuring that interested parties had notice that the agency's information was incomplete, the delay in determining that the missing data was not essential is of no moment.

In short, the ROD concluded that any missing information was non-essential, and the final EIS identified that missing information, discussed its relevance, weighed the available scientific evidence, and presented its conclusions regarding potential environmental impact based on the available data — exactly what 40 C.F.R. § 1502.22(b) would have required if the missing information *had* been essential information.[31] "We will defer to the agency's judgment about the appropriate level of analysis so long as the EIS provides as much environmental analysis as is reasonably possible under the circumstances, thereby providing sufficient detail to foster informed decision-making at the stage in question." *Point Hope*, 740 F.3d at 498 (citations and alterations omitted). Such deference is due here.

## B. Coordination with Counties

A second front of the NEPA challenge concerns requirements in FLPMA and NEPA regarding consultation with local government. As relevant here, FLPMA requires that the Secretary shall, "to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs" of the "local governments within which the lands are located" and shall "provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of

---

[31] Metamin's citation to *Montana Wilderness Association v. McAllister*, 666 F.3d 549 (9th Cir. 2011), is unavailing. We held in *Montana Wilderness Association* that the Forest Service erred in failing to account for the relevance of missing information *at all*. 666 F.3d at 560–61.

land use programs, land use regulations, and land use decisions for public lands." 43 U.S.C. § 1712(c)(9). NEPA's implementing regulations also require that federal agencies "cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements." 40 C.F.R. § 1506.2(b). Metamin and the Counties contend that the Secretary did not fulfill these overlapping obligations. They are wrong.[32]

Interior held public meetings, designated the Counties as cooperating agencies, and met separately with representatives from the Counties. It also considered public comments submitted by the Counties regarding the withdrawal.

Based in part on the comments it received from the Counties, BLM ordered an expanded economic impact analysis for the region and consulted county representatives to determine what, if any, additional data to include in its modeling. The final EIS contained extensive analysis (spanning more than fifty pages) of the potential impact of withdrawal on the Counties and other affected communities, including economic impact, and observed that Mohave County passed a resolution opposing the withdrawal. The record thus demonstrates that Interior fully acknowledged and considered the Counties' concerns regarding the withdrawal, even though it chose in the end to proceed. FLPMA and NEPA require no more. In particular, the *consent* of state and

---

[32] Interior notes that FLPMA's local government coordination requirement applies to "land use plans," 43 U.S.C. § 1712(c), and that a withdrawal from mining claims is not a "land use plan" within the meaning of the statute. We need not address this issue, as we conclude that the agency complied with the consultation requirements, assuming they apply.

local governments to a withdrawal is in no way required — and with good reason, as regional environmental threats must always be balanced against the economic gains the local governments could reap if no federal action were taken. NEPA does not confer veto power on potentially affected state or local governments, each with its own economic interests.

Finally, Appellants propose that Interior did not comply with 40 C.F.R. § 1506.2(d), which requires agencies to "discuss any inconsistency of a proposed action with any approved State or local plan and laws" and, "[w]here an inconsistency exists . . . describe the extent to which the agency would reconcile its proposed action with the plan or law." Appellants maintain that the withdrawal is inconsistent with county resolutions opposing the withdrawal. Those resolutions, however, are not "approved State or local plans or laws." The final EIS and ROD did consider approved county plans and found no inconsistencies or conflicts.

## VI.  Forest Service Consent

The final arrow in Appellants' very large quiver is the contention that the Forest Service's consent to the withdrawal was arbitrary, capricious, or otherwise not in accordance with law, because it did not comply with the National Forest Management Act ("NFMA") multiple-use mandate, 16 U.S.C. § 1604(e), or the terms and conditions of the Kaibab National Forest Plan established under the NFMA. The area withdrawn included approximately 355,874 acres in the South and East Parcel managed by the Forest Service. Including that land in the withdrawal area required the consent of the Forest Service, which the Forest Service provided. AEMA argues that the Kaibab Forest Plan, as of

the effective date of the withdrawal, expressly contemplated the withdrawal from mining only of four specific areas within the forest, making the Forest Service's consent to a larger withdrawal area inoperative.

Neither the Forest Service nor the Department of Agriculture (of which the Forest Service is a part) has the authority to open or close public lands for mining. That authority is delegated only to the Secretary of the Interior. Section 202 of FLPMA specifies that public lands "shall be removed from or restored to the operation of the Mining Law of 1872 . . . or transferred to another department, bureau, or agency *only* by withdrawal action pursuant to [43 U.S.C. § 1714] or other action pursuant to applicable law." 43 U.S.C. § 1712(e)(3) (emphasis added). The specified section of FLPMA, in turn, delegates withdrawal authority to the Secretary of the Interior and states that the Secretary may further delegate that authority only to other presidential appointees within the Department of the Interior. 43 U.S.C. § 1714(a).

The NFMA does not confer withdrawal authority on the Forest Service either. That statute concerns the management of forests and their "renewable resources." 16 U.S.C. § 1600(2). Minerals are not renewable resources and are not directly within the Forest Service's purview.

FLPMA does require that "[i]n the case of lands under the administration of any department or agency other than the Department of the Interior," including the Forest Service, "the Secretary shall make, modify, and revoke withdrawals only with the consent of the head of the department or agency concerned." 43 U.S.C. § 1714(I). Congress may have included the consent requirement within FLPMA in part to

ensure that Interior would account for significant above-ground impacts on lands managed by the Forest Service, or to forestall interagency squabbling concerning jurisdiction over withdrawn lands.  But it decidedly did not confer on the Forest Service (or the Department of Agriculture) the power independently to open or close federal lands to mining.

Further, the Forest Service's consent to the Secretary's withdrawal was not inconsistent with the governing forest plan.  AEMA's argument rests on a faulty premise: that the Forest Plan's recommendation that certain discrete areas under its purview be withdrawn from mining, so as to protect renewable *above-ground* resources, impliedly *granted* mining rights throughout the remainder of the Kaibab National Forest.  Again, the Forest Service has no authority to open or close public lands to mining claims.  And even if it did possess such authority, the Kaibab National Forest Plan did not preclude withdrawals beyond the four discrete areas recommended.  No guidance or directives within the Kaibab Forest Plan suggest that the Forest Service meant to block all withdrawals within the Kaibab National Forest beyond the four identified sites.[33]

---

[33] AEMA also suggests that even if the Forest Service could have consented to the proposed withdrawal consistently with the Kaibab National Forest Plan, the Forest Service failed to provide adequate justification for its consent.  This argument is without merit.  The Forest Service's joint statement of consent with BLM, though brief, referenced the potential environmental impacts to the Kaibab National Forest detailed at greater length in the final EIS.  The Forest Service also noted that it had been a cooperating agency throughout the withdrawal process.

## CONCLUSION

At its core, the merits question in this case is whether the Secretary was allowed to adopt a cautious approach in the face of some risk, difficult to quantify based on current knowledge, to what he called "America's greatest national wonder." Appellants raise a myriad of challenges but in the end identify no legal principle invalidating the Secretary's risk-averse approach. As Interior concluded, withdrawal of the area from new mining claims for a limited period will permit more careful, longer-term study of the uncertain effects of uranium mining in the area and better-informed decisionmaking in the future.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

## APPENDIX A:

## ACRONYMS USED IN THIS OPINION

AEMA       American Exploration & Mining Association

APA        Administrative Procedure Act

BLM        Bureau of Land Management

EIS        environmental impact study

FDAMA      Food and Drug Administration Modernization Act

FDCA       Federal Food, Drug, and Cosmetic Act

FLPMA      Federal Land Policy and Management Act

NEPA       National Environmental Policy Act

NFMA       National Forest Management Act

PLLRC      Public Land Law Review Commission

R-aquifer  Redwall-Muav aquifer

ROD        Record of Decision

SER        Supplemental Excerpts of Record

USGS       United States Geological Survey